| File No. | STATE OF NORTH CAROLINA | In The General Court Of Justice |
|---|---|---|
| | Guilford County | District Court Division-Small Claims |

# COMPLAINT FOR MONEY OWED

G.S. 7A-216, 7A-232

1. The defendant is a resident of the county named above.
2. The defendant owes me the amount listed for the following reason:

**Name And Address Of Plaintiff**
Thomas J. Kirschner
606 Magnolia Ave
Royal Oak, MI 48073

| Principal Amount Owed | $ 10,000.00 |
|---|---|
| Interest Owed (if any) | $ |
| Total Amount Owed | $ 10,000.00 |

**County:** Wayne
**Telephone No.:** 336-999-2726

**VERSUS**

**Name And Address Of Defendant 1** ☐ Individual ☒ Corporation
Volvo Group North America
Volvo Truck Group
7900 National Service Dr
Greensboro, N.C. 27409

**County:** Guilford
**Telephone No.:** 800-528-6586

**Name And Address Of Defendant 2** ☒ Individual ☐ Corporation
Othon Nascimento
8003 Piedmont Triad Parkway
Greensboro NC 27409
Director, Purchasing, Volvo
Volvo Uptimecenter

**County:** Guilford
**Telephone No.:** 800-528-6586

**Name And Address Of Plaintiff's Attorney**

(check one below)

☐ On An Account (attach a copy of the account)
☐ For Goods Sold And Delivered Between
☐ For Money Lent
☐ On a Promissory Note (attach copy)
☐ For a Worthless Check (attach a copy of the check)
☐ For conversion (describe property)
☒ Other: (specify) See Attached Exhibit A

FILED 2019 JUL 22 A 11:46 GUILFORD CO., C.S.C. BY _____

I demand to recover the total amount listed above, plus interest and reimbursement for court costs.

| Date | Name Of Plaintiff Or Attorney (Type Or Print) | Signature Of Plaintiff Or Attorney |
|---|---|---|
| 7-18-19 | Thomas J. Kirschner | Thomas J. Kirschner |

AOC-CVM-200, Rev. 2/12
© 2012 Administrative Office of the Courts

(Over)

## INSTRUCTIONS TO PLAINTIFF OR DEFENDANT

1. The PLAINTIFF must file a small claim action in the county where at least one of the defendants resides.

2. The PLAINTIFF cannot sue in small claims court for more than $10,000.00. This amount may be lower, depending on local judicial order. If the amount is lower, it may be any amount between $5,000.00 and $10,000.00, as determined by the chief district court judge of the judicial district.

3. The PLAINTIFF must show the complete name and address of the defendant to ensure service on the defendant. If there are two defendants and they reside at different addresses, the plaintiff must include both addresses. The plaintiff must determine if the defendant is a corporation and sue in the complete corporate name. If the business is not a corporation, the plaintiff must determine the owner's name and sue the owner.

4. The PLAINTIFF may serve the defendant(s) by mailing a copy of the summons and complaint by registered or certified mail, return receipt requested, addressed to the party to be served or by paying the costs to have the sheriff serve the summons and complaint. If certified or registered mail is used, the plaintiff must prepare and file a sworn statement with the Clerk of Superior Court proving service by certified mail and must attach to that statement the postal receipt showing that the letter was accepted.

5. The PLAINTIFF must pay advance court costs at the time of filing this Complaint. In the event that judgment is entered in favor of the plaintiff, court costs may be charged against the defendant.

6. The DEFENDANT may file a written answer, making defense to the claim, in the office of the Clerk of Superior Court. This answer should be accompanied by a copy for the plaintiff and be filed no later than the time set for trial. The filing of the answer DOES NOT relieve the defendant of the need to appear before the magistrate to assert the defendant's defense.

7. Whether or not an answer is filed, the PLAINTIFF must appear before the magistrate.

8. The PLAINTIFF or the DEFENDANT may appeal the magistrate's decision in this case. To appeal, notice must be given in open court when the judgment is rendered, or notice may be given in writing to the Clerk of Superior Court within ten (10) days after the judgment is rendered. If notice is given in writing, the appealing party must also serve written notice of appeal on all other parties. The appealing party must PAY to the Clerk of Superior Court the costs of court for appeal within twenty (20) days after the judgment is rendered.

9. This form is supplied in order to expedite the handling of small claims. It is designed to cover the most common claims.

10. **The Clerk or magistrate cannot advise you about your case or assist you in completing this form. If you have any questions, you should consult an attorney.**

AOC-CVM-200, Rev. 9/13
© 2013 Administrative Office of the Courts

Small Claims

Guilford County

Plaintiff: Thomas J. Kirschner

Complaint for Money Owed

I interviewed with Volvo Group North America, Volvo Trucks division via video and via telephone conference in follow-up to the video (skype) with Othon Nascimento-Director, Logistics Purchasing.

I was employed with a transportation management firm in Albemarle, NC at the time of the interview and discussions. Mr. Nascimento indicated my role in Logistics purchasing would be a six (6) month assignment at minimum, would likely continue through the end of the year 2019 and there was a strong opportunity to go full-time with Volvo with good performance. He indicated I would be replacing someone who was out on medical leave/workers compensation who would likely not return.

Nascimento told me that he needed me to start right away, as soon as possible at a rate of $45 per hour or $90,000 annual, without benefits. I indicated that if I were to start, I would need to provide some notice to my present employer. He asked that the notice period given be as short as possible, that he needed me to start within a week, as he would be going on vacation and then leaving the country on assignment and needed to get me started. He said that he would be using a company in California to process my payroll for W2.

I resigned my employ in Albemarle, gave short notice per his request vs. standard and started at Volvo on April 15, 2019. Approximately 4-5 days into my employ, Nascimento indicated I needed to provide my I9 immigration-citizen forms and he needed to witness my drivers' license and social security card for him to update the information for this California company. I provided both to him. A few hours later he returned my documents to me and looked like he had "seen a ghost". His demeanor and manner was different, cold and he said to me, "you are a lot older than you look". I was a few days away from 60 years old. I thought right at that time, that his comments could be an issue for me, it was so obvious. It was a scary comment.

At about the same time he brought me to a small conference room and gave me a brief presentation of Volvo Purchasing organization. He discussed the person I was replacing Ms. Sarah Granberg who was out on medical leave and he said, "she may be filing a worker comp claim and she had hired an attorney but he was going to fight it and would not be hiring her back". He told me that she had high "anxiety" medical claim related to his management style (he seemed proud). He told me that Sarah's husband worked for Volvo and it was he who put an attorney on it and stopped the PIP and termination.

He presented to me a Performance Improvement Plan (PIP) he had written for Ms. Granberg. He seemed to be proud of it and went through it briefly showing me that he had written her up for using her cell phone and warned me about cell phone use. He identified problems with the "dray" transportation contracts and I needed to manage a bid/procurement initiative for drayage from ports to all plants but especially Virginia plant. He indicated she had failed to do the intra-Mexico bid and the person in logistics purchasing for Mexico contracts needed me to help ASAP. As a professional manager, I felt uncomfortable. My thought on reviewing the PIP was that there was no objective information relative to costs or performance issues on costs or capacity but rather subjective things like the cell phone use. He then took back the Granberg discipline paperwork. I thought this was odd and inappropriate

to share personal information on Sarah but and felt he was one whose style tried to intimidate and it was meant for me to be intimidated.

A Purchasing Dept. employ also spoke in detail regards Sarah's situation to me. When I inquired as to where I may find supplier contracts and contact information, he indicated that Sarah did not do a good job of making that information available. The contracts database software was filled out incomplete and many contracts were not included. He himself had been looking for the info unsuccessfully. He pulled me into the conference room and told me that Sarah still had her laptop in her possession. He felt this was inappropriate due to the sensitive price information and made the info unattainable. He wanted to call Human Resources and ask them if this was proper and could they get her laptop back from her. He called HR and explained the problem. The HR person said she understood the sensitivities of her having confidential information on her laptop when out on medical and would check into it. He then explained to me that Sarah claimed she was suffering from anxiety due to Othon Nascimento's management style and was out on medical and it would surely become a worker's comp. case.

Mr. Nascimento a few days later met with me and told me he would be going on a week-long vacation, then leaving the country with our whole department. He told me he had hired a new intern from India and that I would be the only one here and I would be responsible for welcoming her and getting her off to a positive start. He indicated that she as a 4.0 student in India and that he hired her right away, because he did not feel that UNC college system was challenging for Greensboro or North Carolina students, that Brazil, where he was from was more challenging and that he would do better bringing her in from India. I was very new and hoped I would be able to introduce her to the right people to get started professionally and with courtesy in fairness to her.

Mr. Nascimento then called a whole team meeting in one of the conference rooms. He told the whole staff that someone on his team had gone to the assistant of the Vice-President of Transport Operations Guillaume Giroudon and made a complaint and had some concerns about how he was managing and he wanted to know who it was. No one volunteered the information and one person said, "It was not me". He then disbanded the meeting.

After the meeting, two of the Purchasing team members both there over 10 years had some conversation with me indicating that the department used to be a lot better before this person came in and they seemed actually angry.

Before he left the country he again met with me and discussed Mario Van den Bussche the segment owner in corporate Sweden, for Sea Container freight and contract logistics. He owned and executed the contracts for sea container transport. Nascimento shared with me that Purchasing was having issues with a small steamship line who was requesting additional dollars above contract rate, due to volumes being 49-52 containers per week vs. the estimated 42 per week. He indicated that Mario in Sweden felt our contracts allowed for +20% or – 20% in volumes for contractual pricing. He was not inclined to give them the increase. I later spoke with Mario who confirmed this position of him and the company. He was very unhappy to learn that Operations VP Giroudan had conducted a meeting with them in Greensboro, as this was inappropriate as it was a Purchasing relationship. He wanted to know "who Guillaume thought he was" to set this meeting with a Purchasing responsible supplier and it was he who owned the relationship. I told him I was new and did not know but Guillaume liked their on-time. Thet Guillaume and I had an email where I shared I had discussed with Hagerstown their thoughts on this steamship line and it was very positive. I had told Guillaume of Hagerstown suggestion of moving more volume on to this steamship line despite cost adds. This steamship line had the very best, outstanding on-time performance, far better than competition. Nascimento indicated that Guillaume Giroudan the VP loved this steamship line and the VP wanted this controversial issue of increase request vs. contract rate, to be resolved by Purchasing. Nascimento indicated it was a delicate issue and very political and he could not afford for VP Giroudan to be unhappy. Nascimento seemed very insecure.

Before he left for vacation, on his last day, I informed Nascimento that I had done some research on the important "drayage" bid he wanted me to handle and that the contracts previously done by Sarah Granberg were complete and active for another year. They did not need to be executed as he had understood and explained when he discussed her performance and my duties. I recommended he not open the contracts again for negotiation, as he faced some risk of increases due to market conditions. While there is always potential to gain cost reduction in negotiation, the market conditions behooved us using the current contracts. He got very upset and said, "this is not what I was told" and "you need to check this out further"! I also shared on our meeting before he left that I began to work on Mexico bid but I was surprised to see that teams were already in place, some data already gathered, the network had a project folder. He indicated that he "couldn't trust what Sarah had done" and I needed to get it started. He seemed to view me as counter to his position or counter to his direction to do this. I simply wanted to clarify as the information was different than he had explained. I explained to him that I was being forced to use my cell phone at work (I did not want to get fired for it). This because the computer sound system and connection at my desk, Sarah's former desk, did not allow persons to hear me or me hear them appropriately. Several people asked that they call me on my cell, including Mario in Sweden, in order to conduct business. I thought this might have explained Sarah's situation as shown to me on her Performance Improvement Plan.

While he was out on vacation, I received a wild call from this steamship lines' Vice-President. He indicated that they needed an increase of $350 on all containers above 42 and that they had 52 that week. He was very upset. I later emailed Nascimento while he was out that I had never been spoken to by a supplier like this person had spoken. I informed this person that I was new and after speaking with contract owner who signed the contracts that the contracts had a 20% variability and Mario was not inclined to give this increase. He started shouting and said he was losing money. He said he read the contract and there was no 20% clause and he would sue us. I told him that I would reach out to Mario to get his opinion on it and I would let his Vice-President in Europe know the result, as this person was the contract signer on their end. This did not satisfy this person who was very upset. He repeated that he was losing money. He finally said to me, "I didn't want to say it but we tried to deliver ten (10) containers to the Virginia plant and they were refused". He had to return the trucks to the port and then would have to deliver them again later. He said this has happened to 5 containers recently and was not the first time. I told him that this was a different story then. I would have to confirm this with Operations and I would share with Mario in Sweden. He was not happy with my deferring to Sweden and wanted me to author an increase that second. I told him it was not in my authority and he hung up the phone.

I then received a call that night on my cell phone on May 3, 2019 at approximately 7:00 pm from Innovative Employee Services, in California, who processed my payroll. I believe I was the only Volvo contracted employee to be paid by them. I had never spoken to this person or AES before, did not know her. Innovative Employee Services cannot be found as a Licensed Personnel Agency in the State of North Carolina.

She said that I should not report back to Volvo, that my employment had ended.

There was no discussion, no counsel or warning, no notice, no severance.

This person whom I did not know or never spoke to said, "that she felt that I would be eligible for unemployment". She indicated she knew there were some issues getting my payroll and direct deposit established and that she would contact someone at Volvo to sign the appropriate paperwork to send me the money. I told her that if that issue continued I would need an emergency, special check, outside of the system for my last paycheck. They indeed did have to execute a special check for me, as I was not yet properly set-up.

I left a permanent position to take on this Volvo opportunity and I would not have left for a 3 week opportunity but longer term, career substantial, based on his promises.

It was to be very exciting to work for Volvo a multi-billion corporation who expressed company values mirroring care for the person, employee. I have not been able to replace the professional position at $7500 for each month, almost 3 months ago, since my termination May 3rd. I now work at Home Depot and earn $11.00 per hour, for 16 hours per week, while continuing to look for better work. It has been devastating to me and my family.

Public policy exceptions to "at will" employment include "covenant of goodwill", Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621-634, "Sides v. Duke", implied employment contracts or terms and any retaliation for evidence or testimony for workers compensation, Shick v. Shirey, 716, A.2d, 1231 (1998).